## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL GROTE AND MARCELLA GROTE,<br><br>*Plaintiff,*<br><br>v.<br><br>AMERICAN ECONOMY INSURANCE CO.,<br><br>*Defendants.* | CIVIL ACTION<br><br>NO. 24-4979 |

**Pappert, J.**                                                                      **January 30, 2025**

### <u>MEMORANDUM</u>

Michael and Marcella Grote are the named insureds on a homeowners policy ("the Policy") issued by American Economy Insurance Company. On January 9, 2024, a wind-blown tree struck their home, damaging some of its siding and possibly the shingled portion of the roof. AEIC agrees that some of the damage to the siding on the northwest portion of the home is covered under the Policy. The parties dispute whether (1) the Policy covers replacement siding for the entire home or just on the damaged portions and (2) the storm caused damage to the shingled roof. AEIC moved for partial summary judgment on both issues and the Court grants the motion as to the siding but denies it with respect to the roof damage.

I

A

On January 9, 2024, a windstorm with strong gusts felled a large tree that struck and damaged the Grotes' home in Feasterville-Trevose, Pennsylvania. (Pl. Brief in Opp. to Mot. for Summ. Judg. at 5, ECF No. 14); (Poole Rep. at 4, ECF No. 13-

19.)  The Grotes subsequently submitted an insurance claim pursuant to the Policy,

which states in relevant part:

> **Building Property We Cover**
>
> **COVERAGE A--DWELLING**
>
> We cover:
>
> 1. the dwelling on the ***residence premises*** shown in your Policy Declarations used principally as a private residence, including structures attached to the dwelling other than fences, driveways or walkways;
> 2. attached carpeting, built-in appliances, fixtures; and
> 3. materials and supplies located on or next to the ***resident premises*** used to construct, alter or repair the dwelling or other structures on the ***resident premises***.
>
> **Building Property Losses We Cover**
>
> We cover accidental direct physical loss to property described in **Building Property We Cover** except as limited or excluded.

(*Id.* at 19.)  The Policy states that losses under this coverage are settled at

"**replacement cost**," which is defined as follows:

> In case of loss or damage to buildings, ***replacement cost*** means the cost, at the time of loss, to repair or replace the damaged property with new materials of like kind and quality, without deduction for appreciation.

(*Id.* at 18.)  Finally, the Policy states:

> We will not pay for the cost to replace and/or match any undamaged siding, ***roof surfacing*** and/or windows due to any mismatch between the existing undamaged siding, ***roof surfacing*** and/or windows on a covered dwelling . . . and any new materials used to repair or replace the damaged siding, roof and/or windows on a covered dwelling . . . because of:
>
> (1) wear and tear, marring, scratching or deterioration;
> (2) fading, weathering, oxidizing or color;
> (3) texture or dimensional differences;
> (4) obsolescence or unavailability of materials; or
> (5) inherent vice, latent defect, mechanical breakdown.

(*Id.* at 32) (emphasis in original).

B

Soon after the storm, the Grotes hired Daniel Overstreet, the owner of "Nailed It Home Improvements," to complete emergency repairs to their home, including to the "left elevation," "siding in multiple areas," the "seam to detached siding," the "aluminum drip edge to right elevation," and other "points of concern." (Overstreet Invoice, ECF No. 14-5); (Overstreet Affidavit ¶¶ 2, 3, ECF No. 14-11.) Overstreet claims he "found clear evidence that the tree struck the roof, causing damage to the shingles." (Overstreet Affidavit ¶ 4.) On January 13, 2024, the Grotes hired Hillis Public Adjusters to "advise and assist" them in the adjustment of the insurance claim arising from the storm damage. (Hillis Contract at 2, ECF No. 13-7.) Hillis assigned the case to James Swartz, a public adjuster licensed in Pennsylvania and New Jersey. (Pl. Brief in Opp. to Mot. for Summ. Judg. at 7); (Swartz CV, ECF No. 14-6.)

On February 12, 2014, Swartz and AEIC's assigned field adjuster, Colin Goodreau, inspected the damage to the Grotes' home and each prepared damage estimates. (Def. Statement of Undisputed Facts ¶ 4, ECF No. 13-1.) Goodreau estimated the Replacement Cost Value ("RCV") of the losses to be $10,542.45 and the net Actual Cash Value ("ACV") to be $7,306.90. (AEIC First Estimate at 9, ECF No. 13-10.)[1] Pursuant to this estimate, and accounting for the Policy's $1,000 deductible, AEIC sent the Grotes a payment of $6,306.90 on February 20, 2024. (First Payment Letter at 2.) Swartz, meanwhile, estimated the RCV to be $100,755.85. (Swartz

---

[1] The ACV reflects a deduction for recoverable depreciation of $2,428.38 and a payment when the loss was incurred of $807.17. (First Payment Letter at 2, ECF No. 13-11.) Although the Policy covers RCV, not ACV, the recoverable depreciation is not paid out until the "damaged or destroyed property is repaired or replaced." (Policy at 30.)

3

Estimate at 14, ECF No. 14-7.)  Swartz stated his estimate "included repairs to the shingled roof as I observed damage to the shingled roof which, in my opinion, were caused by the storm of January 9, 2024." (Swartz Affidavit ¶ 17, ECF No. 14-10.)  The two estimates diverged dramatically because the Swartz estimate included, *inter alia*, "complete replacements of the flat-rubber and shingled roofs and siding on all of the elevations," (Def. Statement of Undisputed Facts ¶ 10), whereas the AEIC replacement included minimal repairs on the roof and new siding only for the damaged portions of the house, (AEIC First Estimate at 5.)

Upon receipt of the Swartz estimate, AEIC assigned adjuster Steven Nicoletti to prepare a revised estimate.  (Def. Statement of Undisputed Facts ¶ 12.)  Nicoletti revised the estimated RCV to $15,394.55 and the ACV to $9,946.20.  (AEIC Second Estimate at 10, ECF No. 13-13.)  As a result, on April 3, 2024, AEIC sent the Grotes an additional $2,639.30, representing the difference between the ACV under the first and second estimates.  (Second Payment Letter at 2, ECF No. 13-15.)  AEIC's increased estimate incorporated some of the repairs recommended in the Swartz estimate, including replacement of rolled roofing on the back portion of the home.  (AEIC Second Estimate E-mail at 2, ECF No. 13-14.)  AEIC still did not approve repairs for the shingled portions of the roof or the undamaged elevations of siding.  (*Id.* at 3.)

AEIC retained ITEL Laboratories, Inc. to identify the siding on the house.  (Def. Statement of Undisputed Facts ¶¶ 6-7.)  ITEL found that the siding was sandy-beige colored ArmorBond Dynaforged vinyl siding that had "excessive" fading.  (ITEL Report, ECF No. 13-9.)  It also found that the original siding was discontinued and proposed two alternative vinyl sidings that were, of varying degrees, similar in color,

embossment, projection, and thickness. (*Id.*) On May 15, 2024, Nicolleti rejected Hillis's renewed request that AEIC pay to replace all the siding on the house because the new siding would not match the original siding. (Nicolleti E-Mail, ECF No. 13-16.)

AEIC retained two other firms to inspect the damage to the home. First, it hired Hudson International Consultants and Engineers to conduct a forensic engineering analysis of the cause and extent of damage to the Grotes' home. (Poole Rep., ECF No. 13-19.) Hudson International assigned forensic engineer John Poole to conduct the study, which he summarized in a report dated December 11, 2024. (*Id.* at 2.) Poole found that "the tree fell from the northwest corner of the back yard, on or near the northwest addition, and the tree branches did not extend to the siding at the east side of the back of the house." (*Id.* at 4.) Further, Poole noted that "the shingled roof did not have scrapes, tears, or fractures in the shingles," and that any damage to the shingles was "on the opposite side of the tree impact." (*Id.* at 8.) He concluded that "[n]o photographs or observations from the site inspection indicate that the tree damaged the shingled part of the roof." (*Id.*) He also observed that "the only indication of damage to the low-slope roof was the patch at the northwest corner of the northwest addition which was a result of the tree impact." (*Id.*)

Next, AEIC hired Ivera Group Forensic Consulting to analyze the "scope and estimated cost of repairs" to the Grotes' home. (Ivera Report at 3, ECF No. 13-20.) Ivera assigned general contractor Steve D'Annunzio to conduct the inspection, who found the following "affected elements": (1) "Exteriors—Vinyl siding, aluminum down spouts, fascia metal", (2) "Roof—aluminum gutters and EDPM roofing", and (3)

"Interior—Window casing, drywall, and paint." (*Id.*) D' Annunzio estimated the RCV to be $10,722.44 and the ACV to be $9,442.43. (*Id.* at 8.)

C

On August 20, 2024, the Grotes sued AEIC in the Philadelphia Court of Common Pleas, alleging breach of contract. *See generally* (Compl., ECF No. 1-6). On September 19, 2024, AEIC removed the case to federal court. (Notice of Removal, ECF No. 1.) Under Local Rule of Civil Procedure 53.2, the Court referred the case to arbitration. (Arbitration Order, ECF No. 12.) The arbitration trial is scheduled for March 11. (ECF No. 18.) AEIC moved for partial summary judgment, arguing the Policy does not cover repairs to the shingled roof or replacement siding for the undamaged portions of the home. (Mot. for Summ. Judg., ECF No. 13.) The Grotes responded on January 3, 2025, and AEIC replied on January 10, 2025.[2] (ECF Nos. 14, 16.)

II

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008). A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson*,

---

[2]    The Grotes also filed a sur-reply, (ECF No. 17), without first seeking leave of Court as required by the Court's Policies and Procedures. *See* Policies and Procedures Rule II.D.3, https://www.paed.uscourts.gov/sites/paed/files/documents/procedures/pappol.pdf. The Court nonetheless accepted and considered the surreply.

477 U.S. at 248. A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). When the movant is the defendant, they have the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of [his] case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains their initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts in the light most favorable to the non-moving party. *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001). Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III

Both parties agree that a portion of the home's siding was damaged by the tree and that replacement siding for that portion is covered under the Policy. The Grotes,

7

however, seek the replacement of *all* siding on the home so that it matches the replacement siding on the damaged portion of the home. They contend the replacement siding AEIC proposes for the damaged siding is not "of like kind and quality," (Policy at 18,) or of "equivalent construction," (*id.* at 30), so AEIC "is required to replace all of the [siding] on the property." (Brief in Opp. to Mot. for Summ. Judg. at 7.)[3] AEIC contends that, regardless of whether the replacement siding is of like kind and quality, the Policy covers repairs for the damaged siding only.

In Pennsylvania, "the interpretation of an insurance contract regarding the existence or non-existence of coverage is generally performed by the court." *Gardner v. State Farm Fire & Ca. Co.*, 544 F.3d 553, 558 (3d Cir. 2008) (quotation omitted); *see also Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006) ("The interpretation of an insurance policy is a question of law."). "When the language of the policy is clear and unambiguous, we must give effect to that language." *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007) (quotation omitted). If the policy language is ambiguous, it must be construed against the insurer. *Med. Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir. 1999).

The Policy's language is clear and unambiguous. It covers losses only to "damaged property," (Policy at 18), and includes a matching exclusion stating that AEIC "will not pay for the cost to replace and/or match any undamaged siding . . . due to any mismatch between the existing undamaged siding . . . and any new materials used to repair or replace the damaged siding . . . because of . . . obsolescence or

---

[3]    The ITEL report and the Swartz affidavit create a genuine dispute of material fact over whether ITEL's proposed siding is "of like kind and quality" as the Grotes' home. But regardless of whether ITEL's proposed alternative siding is of like kind and quality, the Policy does not cover replacement siding for the undamaged portions of the home.

unavailability of materials." (Policy at 32.)  Thus, regardless of whether replacement materials are of "like kind and quality" or "equivalent construction," the Policy does not cover replacement siding on undamaged portions of the home.

Other courts have held the same.  In *Greene v. United Servs. Auto. Ass'n*, 936 A.2d 1178 (Pa. Super. Ct. 2007), the Pennsylvania Superior Court rejected the same argument the Grotes make because the language of the contract "clearly and unambiguously requires USAA to pay the replacement cost of the part of the building damaged."  *Id.* at 1186; *see also Enwereji v. State Farm Fire & Cas. Co.*, No. 10-cv-4967, 2011 WL 3240866, at *5-6 (E.D. Pa. 2011) (rejecting similar argument and collecting cases); *Pellegrino v. State Farm Fire & Cas. Co.*, No. 12-2065, 2013 WL 3878591, at *4-5 (E.D. Pa. July 29, 2013); *Fazio*, 2017 WL 1102713, at *6.  Reading the Policy to mandate the replacement of siding not damaged by the storm would allow the Grotes to "exploit their losses and use them as an opportunity to remodel their home[] at the insurer's expense."  *Burton v. Republic Ins. Co.*, 845 A.2d 889, 896 (Pa. Super. Ct. 2004).

The Grotes rely on *Collins v. Allstate Insurance Co.*, No. 09-cv-01824, 2009 WL 4729901 (E.D. Pa. Dec. 10, 2009), believing that court adopted their same argument as a matter of law.  It did not.  *See, e.g.*, *Pellegrino*, 2013 WL 3878591, at *6 ("[*Collins*] did not, as Plaintiffs urge, directly and definitively state that as a matter of law, an insurer must provide 'matching' replacement for an entire section of property.").  Rather, that court found that there was an issue of material fact over whether the new materials were of "like kind and quality."  *Collins*, 2009 WL 4729901, at *6.  Even so, to the extent the *Collins* court implicitly adopted the Grotes' same argument, the policy in

9

that case did not contain an exclusion clearly precluding the replacement of undamaged siding because of mismatching like the Policy here does.

The Grotes next claim that AEIC's reading of the matching exclusion would render superfluous the Policy's coverage of "damaged property." True, "[a]n interpretation will not be given to one part of the contract which will annul another part of it." *Capek v. Devito*, 767 A.2d 1047, 1050 (Pa. 2001) (citations omitted). But the exclusion does no such thing. The Policy states that it only covers repairs to the damaged siding with materials of like kind and quality. And the exclusion clarifies that, if siding of like kind and quality is unavailable, or if new siding of like kind and quality doesn't match the old siding due to wear and tear, AEIC will not pay to replace the undamaged siding.

Finally, the Grotes claim the matching exclusion renders the contract illusory by allowing AEIC "to pay for a repair that is impossible to make and take away the very coverage that the Plaintiffs contracted for." (Brief in Opp. of Mot. for Summ. Judg. at 9.) An illusory contract is "[a]n agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation." *Carrone v. UnitedHealth Grp. Inc.*, No. 20-2742, 2021 WL 3520809, at *2 (3d. Cir. Aug. 11, 2021) (citing Black's Law Dictionary (11th ed. 2019)). The exclusion does not render the Policy illusory. It is undisputed that AEIC is obligated under the Policy to pay for losses to damaged property; the exclusion does not affect that obligation.[4]

---

[4]       Nor does the application of the exclusion disrupt the "reasonable expectations of the insured." (Brief in Opp. to Mot. for Summ. Judg. at 9.) Any expectation at the time of contracting that the policy would cover replacement of *all* siding, despite its plain language to the contrary, would have been unreasonable.

IV

AEIC next contends the windstorm did not cause any covered "accidental direct physical loss" to the shingled roof.  (Mot. for Summ. Judg. at 1); (Policy at 19.)[5]  The record contains contesting assessments on the causation issue which preclude entry of summary judgment and are more appropriate for the arbitration panel to weigh.

Although the Policy does not define "accidental direct physical loss," Courts applying Pennsylvania law have defined "accidental" as "something that occurs unexpectedly or unintentionally," *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 898 (Pa. 2006), and "direct physical loss" as "a loss that results immediately and proximately from an event," *Cher-D, Inc. v. Great American Alliance Ins. Co.*, No. 05-5936, 2009 WL 943530, at *6 (E.D. Pa. Apr. 7, 2009) (quotation omitted).  The parties each rely on witnesses of varying levels of expertise who disagree over whether the windstorm or the tree immediately and proximately damaged the shingled roof.

AEIC retained Hudson International and forensic engineer John Poole to analyze the scope and extent of damage to the Grotes' house from the windstorm.  In his report, Poole found some "irregular granule loss" and some other damage to the shingled roof, (Poole Rep. at 3-4), but concluded "[n]o photographs or observations from the site inspection indicate that the tree damaged the shingled part of the roof."  (*Id.* at

---

[5]        All agree that the shingled roof is slightly damaged.  (Poole Rep. at 8 ("Irregular areas of granule loss were at the east side of the roof.")); (Swartz Estimate at 4 (recommending replacement shingles)).  The dispute is over whether the storm caused it.

8.)  He also concluded that there was insufficient evidence "to draw a conclusion that wind damaged the shingles."  (*Id.*)[6]

The burden shifts to the Grotes to point to evidence in the record creating a genuine dispute as to whether the tree or windstorm damaged the shingled roof.  While the Grotes themselves did not see any signs of storm damage to the shingled roof, (Marcella Grote Dep. at 46:3-11, ECF No. 13-17); (Michael Grote Dep. at 46:3-11, ECF No. 13-17), they point to two witnesses who purportedly did: (1) James Swartz, a public adjuster at Hillis Adjustment Agency, who prepared a repair estimate for the Grotes, and (2) Daniel Overstreet, who made emergency repairs shortly after the storm, charging the Grotes $1,500 for his services.  (Brief in Opp. to Mot. for Summ. Judg. at 4-5); (Swartz Estimate); (Overstreet Invoice.)  The Grotes submitted the Swartz estimate and the Overstreet invoice, as well as unsworn affidavits from both of them.[7]  *See generally* (Swartz Affidavit); (Overstreet Affidavit).

Swartz inspected the Grotes' home five weeks after the storm and estimated the cost to repair it, including thousands of dollars for new shingling on the roof.  (Swartz Estimate at 3-4.)  The estimate does not speak to the cause of the shingled roof damage, though Swartz stated in his affidavit that the damage he observed on the roof "was

---

[6]      AEIC also presented a forensic analysis report from Ivera Group conducted by building consultant Steve D'Annunzio.  (D'Annunzio Rep. at 3.)  Although this report did not directly address the issue of causation, D'Annunzio describes the "affected elements" of the roof as the "aluminum gutters and EDPM roofing," (*id.*), which is similar to AEIC's internal findings, (AEIC Second Estimate at 4-5.)

[7]      Unsworn affidavits, perhaps more aptly labeled "unsworn statements," are typically not permitted.  *See Woloszyn v. County of Lawrence*, 396 F.3d 314, 323 (3d Cir. 2005).  But if an unsworn statement is made under penalty of perjury and dated, courts may consider it at summary judgment.  *See* 28 U.S.C. § 1746.  While the statute provides example language that meets its requirements, it allows language that is in "substantially" the same form. *Id.*

Swartz and Overstreet's unsworn statements are dated and acknowledge the penalties for falsifying information, allowing the Court to consider them at this stage.

fresh and not old or pre-existing," leading him to conclude that the damage to the shingled roof was "caused by the storm of January 9, 2024." (Swartz Affidavit ¶¶ 8, 17.) Swartz has fifteen-years' experience as a licensed public adjuster in Pennsylvania and New Jersey. (Swartz C.V., ECF No. 14-6.)

In its motion for partial summary judgment, AEIC for the first time purports to challenge Swartz's qualifications to offer an opinion on causation. (Brief in Supp. of Mot. for Summ. Judg. at 7-9.) AEIC references a line of cases holding that "licensed public adjusters—without more—cannot offer an opinion on the cause of a particular occurrence." *Coates v. Metro. Prop. & Cas. Ins. Co.*, 625 F. Supp. 3d 347, 356 (E.D. Pa. 2022); *see also Balu v. Cincinnati Ins. Co.*, No. 19-3604, 2021 WL 1427651, at *3 (E.D. Pa. 2021) (citing *Aloe Coal*, 816 F.2d 110). But where the public adjuster nonetheless possesses "skill or knowledge greater than the average layman" that qualifies him to opine on causation, he may do so. *Aloe Coal*, 816 F.2d at 114; *see also, e.g.*, *Coates*, 625 F. Supp. 3d at 356; *Zeqa v. Hanover Ins. Co.*, No. No. 21-10066, 2024 WL 4117426, at *9-10 (D.N.J. Sept. 9, 2024); *Equinox Props., LLC v. Harford Mut. Ins. Co.*, No. 21-15929, 2023 WL 5447279, at *3 (D.N.J. Aug. 24, 2023); *Patton v. Metro. Lloyds Ins. Co. of Tex.*, No. 21-CV-074, 2022 WL 2898946, at *4 (N.D. Tex. Feb. 14, 2022). These cases all involved motions to preclude the adjuster from offering an opinion on causation.

The record suggests Swartz's experience is not limited to public adjusting—he worked for twenty-five years as a general contractor and claims to specialize in, *inter alia*, "windstorm damage" and "roof damage." (Swartz C.V.) Without the benefit of expert discovery, a motion (and briefing) seeking to preclude Swartz and a possible hearing which could allow the Court to fully assess Swartz's qualifications and

experience, the Court is hard pressed, as a matter of law, to disregard Swartz's assessment. *See Woolums v. Nat'l RV*, 530 F. Supp. 2d 691, 704 (M.D. Pa. 2008) (rejecting challenge at summary judgment to propriety of expert testimony based on lack of expert depositions and briefing, along with record evidence of proposed expert's industry experience). The arbitrators should be able to consider his opinion and assign it the weight they think it deserves.[8]

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*

Gerald J. Pappert, J.

---

[8] The proposed testimony of Daniel Overstreet is another matter. Overstreet invoiced the Grotes after completing emergency repairs to their home, augmented by a conclusory affidavit. The Court has no information on Overstreet's background or expertise.
While the Grotes claim the invoice demonstrates that there was "actual damage to the roof," (Brief in Opp. to Mot. for Summ. Judg. at 4), the document says nothing of roof damage—it evidences repairs to the siding, the left and right elevations, and other "points of concern." See (Overstreet Invoice). In his affidavit, Overstreet merely says "[t]he damage looked fresh and was consistent with a recent event." (Overstreet Affidavit ¶ 6.) The Court does not know the "clear evidence" that left Overstreet with such conviction that the tree struck the shingled roof. (*Id.* ¶ 4.) Nor does the affidavit speak to Overstreet's qualifications to offer such a thought.